# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| RODRIQUEZ JAMISON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO.: 2:08-CV-232-TS |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Plaintiff Rodriquez Jamison appealed to the district court from a final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The Plaintiff claims she is entitled to DIB and SSI because her impairments equal a listing in the Social Security regulations. Additionally, she claims that even if her impairments do not equal a listing, the ALJ's determination of her residual functional capacity to work was flawed.

On August 20, 2008, this Court referred the matter to Magistrate Judge Andrew P. Rodovich for a report and recommendation. On January 2, 2009, the Plaintiff filed her Opening Brief [DE 13], on April 22 the Defendant filed his Memorandum in Support Commissioner's Decision [DE 19], and on April 27 the Plaintiff filed her Reply Brief [DE 20]. Magistrate Judge Rodovich filed a Report and Recommendation [DE 21] on December 11, 2009, recommending that the Commissioner's decision be reversed and that the matter be remanded to the administrative law judge (ALJ) to determine whether the Plaintiff's walking limitation was equivalent to the listing for muscoloskeletal impairments. The Magistrate Judge recommended upholding the ALJ's decision on all other grounds challenged by the Plaintiff.

On December 22, the Defendant filed his Objections to Magistrate Judge's Report and Recommendation [DE 22]. The Defendant argues that the Court should not, as the Magistrate Judge recommended, remand this matter for the ALJ to consider whether the Plaintiff's walking limitations support a finding that she has an impairment that is medically equivalent to the musculoskeletal listing. On December 28, the Plaintiff filed her Objections to Magistrate Judge's Report and Recommendation [DE 23]. The Plaintiff maintains that instead of remanding her case for the ALJ to consider the musculoskeletal listing, the Court should find that her twenty foot walking restriction supports a finding of disability as a matter of law. The Plaintiff objects to the Report and Recommendation finding that the ALJ's failure to address stress incontinence was harmless error, to the finding that the ALJ adequately discussed the Plaintiff's sleep apnea, and to the conclusion that the ALJ's decision regarding the weight given to treating physicians' opinions was supported by substantial evidence.

Because the Defendant and the Plaintiff have objected to the Magistrate Judge's Report and Recommendation, this Court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1).

**A.      Listing Equivalence**

At Step Two of the Social Security Administration's five-step sequential process, *see* 20 C.F.R. 404.1520, the ALJ found that the Plaintiff had the following severe impairments: morbid obesity; chronic obstructive pulmonary disease (COPD); mild cardiomegaly; and hypertensive cardiovascular disease. At Step Three, he found that the Plaintiff did not have an impairment or

combination of impairments that met or equaled any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The Plaintiff disagrees with the finding at Step Three. The Plaintiff maintains that her recognized residual functional capacity to walk only twenty feet at a time is such an extreme limitation that it supports a listing equivalence finding as a matter of law. Accordingly, the Plaintiff urges the Court to reverse and remand this matter for an award of benefits without further proceedings. The Defendant, on the other hand, submits that substantial evidence supports the ALJ's findings, and objects to the Magistrate Judge's recommendation that the matter be remanded for the ALJ to consider the applicability of the musculoskeletal listing.

The listings of impairments describe those impairments that are considered presumptively disabling when specific criteria are met. See 20 C.F.R. § 404.1525(a). If an impairment is not the same as a listed impairment, the ALJ must determine whether the impairment is medically equivalent to a listed impairment. 20 C.F.R. § 404.1529(d)(3). Where a claimant has a "combination of impairments, no one of which meets a listing," "we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing." 20 C.F.R. § 404.1526(b)(3).

The regulations provide that, in making this determination,

> we will consider medical equivalence based on all evidence in your case record about your impairment(s) and its effects on you that is relevant to this finding. In considering whether your symptoms, signs, and laboratory findings are medically equal to the symptoms, signs, and laboratory findings of a listed impairment, we will look to see whether your symptoms, signs, and laboratory findings are at least equal in severity to the listed criteria. However, we will not substitute your

3

> allegations of pain or other symptoms for a missing or deficient sign or laboratory finding to raise the severity of your impairment(s) to that of a listed impairment. If the symptoms, signs, and laboratory findings of your impairment(s) are equivalent in severity to those of a listed impairment, we will find you disabled. If it does not, we will consider the impact of your symptoms on your residual functional capacity.

20 C.F.R. § 404.1529(d)(3); *see also* 20 C.F.R. § 404.1526(a) (stating that an impairment "is medically equivalent to a listed impairment . . . if it is at least equal in severity and duration to the criteria of any listed impairment"). The responsibility for deciding medical equivalence rests with the ALJ. 20 C.F.R. § 404.1526(e).

The Plaintiff, without identifying a particular impairment, claims that her walking limitation equals the listing for a musculoskeletal impairment. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00. To meet or equal a listed impairment, a claimant must satisfy all of the criteria set forth in the listing. *See Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). The burden of proving that her condition meets or equals a listed impairment rests with the claimant. *Id*.

The ALJ specifically considered whether the Plaintiff's COPD satisfied the requirements for listing 3.02A and also considered listing 3.02C, which both relate to the respiratory system. In doing so, the ALJ consulted a medical expert, noting that he

> testified that the claimant's impairments do not meet or equal any of the specific criteria found under the Listing of Impairments. Based on his expertise, knowledge and experience in evaluating medical evidence within the Social Security disability program, and absent any substantial evidence to the contrary, I accept his opinion on this matter.

(R. at 23.) The Plaintiff does not challenge the ALJ's findings related to listing 3.02. Rather, she claims that he should have considered whether her walking restriction was medically equivalent to the listing for musculoskeletal impairments.

The ALJ did not specifically refer to listing 1.00, which is the listing for impairments of

4

the musculoskeletal system. Typically, an ALJ's failure to refer explicitly to a relevant listing does not alone require remand because a reviewing court is concerned primarily with tracing an ALJ's reasoning. *Rice v. Barhnart*, 384 F.3d 363, 369–70 (7th Cir. 2004); *see, e.g., Barnette v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2000) (noting that the ALJ correctly recognized a listing despite not citing it within the opinion). However, remand may be necessary where failure to refer to a relevant listing is combined with a superficial analysis. *Id.* at 370.

This is not a case where the ALJ failed to explicitly refer to the listings that he considered. Nor was his analysis perfunctory. The reasonable assumption, based on the record, is that he did not consider any listings (other than 3.02A and 3.02C) to be relevant or applicable. If substantial evidence supports the ALJ's Step Three determination, this Court will not disrupt it. *See Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (stating that court will affirm the ALJ's decision if it is supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). The Plaintiff bears the burden of proving that the musculoskeletal listing was applicable.

> The regulations for the musculoskeletal listings provide:
>
> A. Disorders of the musculoskeletal system may result from hereditary, congenital, or acquired pathologic processes. Impairments may result from infectious, inflammatory, or degenerative processes, traumatic or developmental events, or neoplastic, vascular, or toxic/metabolic diseases.
>
> B. Loss of function.
>
> 1. General. Under this section, loss of function may be due to bone or joint deformity or destruction from any cause; miscellaneous disorders of the spine with or without radiculopathy or other neurological deficits; amputation; or fractures or soft tissue injuries, including burns, requiring prolonged periods of immobility or convalescence. The provisions of 1.02 and 1.03 notwithstanding, inflammatory arthritis is evaluated under 14.09 (see 14.00D6). Impairments with neurological causes are to be evaluated under 11.00ff.

2. How We Define Loss of Function in These Listings

   a. General. Regardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment. The inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months. For the purposes of these criteria, consideration of the ability to perform these activities must be from a physical standpoint alone. When there is an inability to perform these activities due to a mental impairment, the criteria in 12.00ff are to be used. We will determine whether an individual can ambulate effectively or can perform fine and gross movements effectively based on the medical and other evidence in the case record, generally without developing additional evidence about the individual's ability to perform the specific activities listed as examples in 1.00B2b(2) and 1.00B2c.

   b. What We Mean by Inability to Ambulate Effectively

   (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

   (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the

> inability to walk a block at a reasonable pace on rough or uneven
> surfaces, the inability to use standard public transportation, the
> inability to carry out routine ambulatory activities, such as
> shopping and banking, and the inability to climb a few steps at a
> reasonable pace with the use of a single hand rail. The ability to
> walk independently about one's home without the use of assistive
> devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B.

There is no dispute that the Plaintiff's impairments do not meet the criteria of a musculoskeletal listing. The Plaintiff argues that her impairment is of equal medical significance to musculoskeletal impairment because it results in an extreme limitation of the ability to walk. This limitation alone, however, does not render the Plaintiff's impairments closely analogous to those that are listed as musculoskeletal impairments, and it was not improper for the ALJ to fail to consider her impairments in connection with this listing. The record does not support a conclusion that the Plaintiff had loss of function that is anticipated by the listing. She did not have an "inability to ambulate effectively" or any severe disturbance of the musculoskeletal system. Thus, it is difficult to see how any of the Plaintiff's impairments were medically equivalent to the Categories of Musculoskeletal Impairments provided in the regulations:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross
> anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis,
> instability) and chronic joint pain and stiffness with signs of limitation of motion
> or other abnormal motion of the affected joint(s), and findings on appropriate
> medically acceptable imaging of joint space narrowing, bony destruction, or
> ankylosis of the affected joint(s).
>
> * * *
>
> 1.03 Reconstructive surgery or surgical arthrodesis of a major weight-bearing
> joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to
> effective ambulation did not occur, or is not expected to occur, within 12 months
> of onset.
>
> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis,

spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.

* * *

1.05 Amputation (due to any cause).

* * *

1.06 Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones.

** *

1.07 Fracture of an upper extremity with nonunion of a fracture of the shaft of the humerus, radius, or ulna, under continuing surgical management, as defined in 1.00M, directed toward restoration of functional use of the extremity, and such function was not restored or expected to be restored within 12 months of onset.

1.08 Soft tissue injury (e.g., burns) of an upper or lower extremity, trunk, or face and head, under continuing surgical management, as defined in 1.00M, directed toward the salvage or restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset. Major function of the face and head is described in 1.000.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

By considering the Plaintiff's impairments in the context of the listing for the respiratory system, the ALJ considered chronic persistent infections of the lung, episodic respiratory disease such as asthma, pulmonary function testing, chronic impairment of gas exchange, pulmonary vascular disease, sleep-related breathing disorders (sleep apneas), and the effects of obesity. The ALJ specifically considered 3.02A, listing COPD as a category of impairment, and 3.02C, listing chronic impairment of gas exchange due to clinically documented pulmonary disease. Given the impairments that the ALJ recognized as severe, there is no evidence to suggest that the Plaintiff's walking limitation was not properly addressed as a respiratory system impairment. Substantial evidence supports the conclusion that her walking limitation was not the result of an inability to

ambulate effectively or to a musculoskeletal impairment, but to shortness of breath caused by respiratory disorders. The Plaintiff did not present any evidence to the contrary. Therefore, substantial evidence supports the ALJ's decision to consider the Plaintiff's impairments under the listing for respiratory impairments, and the Court does not adopt the Report and Recommendation to remand this matter for the ALJ to consider the musculoskeletal listing. The ALJ's Step Three determination is affirmed.

B.     **Failure to Consider Stress Incontinence and Sleep Apnea**

The Plaintiff contends that the ALJ failed to consider all of her diagnosed impairments, specifically stress incontinence and sleep apnea, when determining her residual functioning capacity.

1.     *Stress Incontinence*

The determination of residual functional capacity is an assessment of what work-related activities the plaintiff can perform despite her limitations. 20 C.F.R. § 404.1545(a)(1). It must be based on all of the relevant evidence in the record. *Id.* In making his residual functional capacity determination, the ALJ failed to specifically discuss the Plaintiff's diagnosed stress incontinence. The Report and Recommendation concluded that the ALJ's failure to consider stress incontinence was harmless error for which remand is not appropriate. The Plaintiff objects to the finding of harmless error.

In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line

of evidence contrary to the ruling. *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). As stated by the Magistrate Judge, an ALJ's failure to analyze a line of evidence is subject to the harmless error analysis. *See Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). In *Prochaska*, the court found that an ALJ's failure to explicitly consider the effects of obesity was harmless error because the ALJ implicitly considered the plaintiff's obesity through his review and discussion of reports from doctors who acknowledged her obesity and discussed her weight. Additionally, no medical opinion in the record identified the plaintiff's obesity as significantly aggravating her back injury or contributing to her physical impairments. *Id.* at 737. Similarly, in *Skarbek*, the ALJ did not address the claimant's obesity, but did adopt the limitations suggested by doctors who were aware of the condition, and thus the claimant's obesity was indirectly factored into the ALJ's decision. 390 F.3d at 504. That, combined with the claimant's failure to specify how his obesity further impaired his ability to work rendered the error harmless. *Id.*

Here, the Magistrate Judge found that the ALJ considered the opinions of the Plaintiff's treating and reviewing physicians who were aware of her stress incontinence, and that, furthermore, the record showed that the condition was not serious and could be treated as Dr. Jilhewar testified.

The Plaintiff submits that the cases finding harmless error are distinguishable because the plaintiffs were not claiming that obesity was itself an impairment. In contrast, the Plaintiff here is "alleging an entirely separate diagnosis and work related limitation, specifically the need for unscheduled breaks every half hour to hour to use the restroom." (Pl.'s Objections 2, DE 23.) The Plaintiff argues that the ALJ could find additional work related limitations if he accepted the

Plaintiff's testimony regarding her stress incontinence and rejected Dr. Jilhewar's testimony.

The ALJ heard testimony from the Plaintiff regarding her frequent need to go to the bathroom, every one hour (on good days) and every one-half hour (on bad days). Dr. Jilhewar testified that, although the Plaintiff had a diagnosis of stress incontinence during a pelvic floor exam conducted on February 2, 2002, it was not severe. He also testified that the Plaintiff had taken medication that was not appropriate to help with incontinence, and that she did not want to take medication for the stress incontinence. (R. at 480.) The February 2 exam reported that the Plaintiff's pelvic muscle strength was at a level 2, which was characterized as moderate strength. (R. at 188.) Ultimately, the ALJ adopted the work limitations proposed by Dr. Jilhewar as the restrictions that were supported by the objective medical evidence. These limitations did not require frequent, unscheduled breaks. However, the ALJ's opinion does not mention the pelvic floor exam, any diagnosis of stress incontinence, or any of the testimony regarding stress incontinence. Additionally, although the ALJ discounted the opinions of two treating physicians who completed questionnaires regarding the Plaintiff's residual functional capacity, limitations for stress incontinence did not appear to be a factor in their opinions, and the Court cannot be confident that the ALJ considered the Plaintiff's stress incontinence, even implicitly—and simply rejected it as an impairment that would require frequent unscheduled breaks. *See, e.g., Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (holding that the ALJ improperly failed to consider the claimant's pelvic floor and urinary disorders, and that the court had "frequently reminded the agency that an ALJ must consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation").

The Court cannot be sure that this omission did not affect the outcome of the case. *See*

*Shramek v. Apfel*, 226 F.3d 809, 814–15 (7th Cir. 2000) (holding that a reviewing court is not required to reverse an ALJ's decision where an error did not ultimately affect the outcome of the case). One of the hypotheticals the ALJ presented to the vocational expert included a restriction for frequent bathroom breaks. Addressing this hypothetical, the vocational expert testified that the Plaintiff would not be able to perform her past work, and there would be no transferable skills and no other work she could perform. (R. at 477–78.) However, the hypothetical that included this restriction also contained other more severe limitations, which were rejected by the medical expert and the ALJ. Thus, it is unknown whether this restriction, when added to those that the ALJ found to be applicable, would prevent the Plaintiff from performing the word processing jobs identified by the vocational expert. Although an ALJ may decline to analyze a vocational expert's response to hypotheticals that are based on limitations that the ALJ justifiably rejected, *Latkowski v. Barnhart*, 93 Fed. Appx. 963, 974 (7th Cir. 2004), nothing in the record creates a logical bridge between the evidence regarding stress incontinence and the ALJ's decision not to adopt a limitation for frequent bathroom breaks. The Court does not adopt the portion of the Report and Recommendation finding that the ALJ's failure to address stress incontinence was harmless error, and reverses the ALJ's Step Three finding.

**2.**     *Sleep Apnea*

The Plaintiff argues that the ALJ's decision regarding sleep apnea should not be upheld, and characterizes the Magistrate Judge's conclusion that the ALJ found that the Plaintiff's sleep apnea was resolved with the use of a breathing machine as an "error of fact." (Pl.'s Obj 2, DE 23.) The Plaintiff maintains that when the record is viewed as a whole, the evidence reveals that

the Plaintiff continued to suffer from sleep apnea despite treatment, pointing to a study in August 2006 that showed continued apneic events.

In his written opinion, the ALJ noted the testing that the Plaintiff underwent in April 2006, and that her symptoms were resolved with CPAP (Continuous Positive Airway Pressure) titration. "As a result, Dr. Jilhewar stated there is no diagnosis of 'severe' sleep apnea." (R. at 23.) The ALJ cited Dr. Jilhewar's testimony that the Plaintiff was only fifty-five percent compliant with her use of the CPAP machine in August 2006, and felt better when using it. The ALJ noted that the Plaintiff testified that after about four hours of rest, she woke up every hour on the hour.

An ALJ is not required to address every piece of evidence, but he must articulate some legitimate reason for his decision, and must build an accurate and logical bridge from the evidence to his conclusion. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). The ALJ did this in regard to his conclusion that the Plaintiff's sleep apnea was not severe and did not have limiting effects, specifically citing the findings of the medical expert and of the sleep studies conducted on the Plaintiff. The Plaintiff has not pointed to any evidence that would support a finding that the sleep disruptions she experienced warranted a specific work restriction or impacted her residual functional capacity. Regarding the Plaintiff's own testimony that she did not receive adequate relief from her CPAP machine, the ALJ noted Dr. Jihewar's testimony that she was only about fifty-five percent compliant with its use, and did report feeling better when using it. In assessing a claimant's credibility, an ALJ can consider noncompliance with prescribed treatment. An ALJ may determine that an individual's statements are less credible when records show that he is not following the treatment as prescribed and there are no good

reasons for this failure. 20 C.F.R. § 416.930(a) & (b) ("[I]f you do not follow the prescribed treatment without a good reason, we will not find you disabled"); *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) (noting that a failure to follow a recommended course of treatment weighs against a claimant's credibility); SSR 96-7p (stating that an individual's statements may be less credible if the record indicates that the individual is not following the treatment prescribed). The Plaintiff did not offer any reason for her noncompliance and her arguments do not convince this Court that the ALJ failed to consider the evidence related to her sleep apnea, or that his factual finding was not supported by evidence that a reasonable person would accept as adequate to support the conclusion. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The Court will not reweigh the evidence to give greater weight to the specific findings that the Plaintiff believes supports her claim of disability.

## C.     Weight Given to Treating Physicians' Opinions

Opinions of a treating physician are generally entitled to controlling weight. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). However, an ALJ may reject the opinion of a treating physician if it is based on a claimant's exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1177–78 (7th Cir. 2001). Guidance in evaluating the opinions of treating and nontreating sources is provided in 20 C.F.R. § 404.1527:

> (d) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a

source who has examined you than to the opinion of a source who has not examined you.

(2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because

nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors. When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

(f) Opinions of nonexamining sources. We consider all evidence from nonexamining sources to be opinion evidence. When we consider the opinions of nonexamining sources, we apply the rules in paragraphs (a) through (e) of this section. In addition, the following rules apply to State agency medical and psychological consultants, other program physicians and psychologists, and medical experts we consult in connection with administrative law judge hearings and Appeals Council review:

(1) In claims adjudicated by the State agency, a State agency medical or psychological consultant (or a medical or psychological expert (as defined in § 405.5 of this chapter) in claims adjudicated under the procedures in part 405 of this chapter) will consider the evidence in your case record and make findings of fact about the medical issues, including, but not limited to, the existence and severity of your impairment(s), the existence and severity of your symptoms, whether your impairment(s) meets or equals the requirements for any impairment listed in appendix 1 to this subpart, and your residual functional capacity. These administrative findings of fact are based on the evidence in your case record but are not themselves evidence at these steps.

20 C.F.R. § 404.1527.

Each medical opinion, other than a treating physician's opinion entitled to controlling

weight, must be evaluated pursuant to the factors set forth in 20 C.F.R. §§ 404.1527(d) to determine the proper weight to apply to it. *See* 20 C.F.R. §§ 404.1527(d); *see generally White v. Barnhart*, 415 F.3d 654, 658–60 (7th Cir. 2005). In determining the Plaintiff's RFC, the ALJ stated that he "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 . . . [and that] in the end, [he] accepted Dr. Jilhewar's opinion of residual functional capacity." (R. at 24.) The ALJ noted that Dr. Jilhewar's conclusions were well supported and thoroughly explained, that his conclusions were consistent with the record, that he specialized in internal medicine, and that Dr. Jilhewar had taken into consideration all the relevant medical information that he received. Regarding Dr. Jelhewar's opinion, the ALJ also wrote:

> For example, he explained that he limited the claimant to sedentary work, as opposed to light work as determined by the State agency physicians (Exhibit 16F), because of her morbid obesity, relatively low FEV1 reading of 1.38L from October 2005, and single exacerbation of chest pain/congestive heart failure in early 2005. Moreover, his assessment provides reasonable environmental accommodations for the claimant's COPD, and he also limited her postural activities consistent with same. Lastly, he restricted lifting/carrying in accordance with the claimant's testimony.

(R. at 26.) Regarding the more severe restrictions submitted by the Plaintiff's treating physicians, such as being able to sit only two hours during an eight-hour day, having a limited ability to grasp, turn, and twist objects, having an inability to tolerate even low stress work due to her asthma, and being required to elevate her legs four out of eight hours, the ALJ wrote:

> Dr. Jilhewar, in reviewing the above, testified that there is no objective medical basis for such severe restrictions, and I agree with him on that matter. He noted, particularly, that the assessments appear to be based in part on the erroneous assumption that the claimant has New York Heart Association class III heart disease, which is *not* the case (*See* Exhibit 14F, p. 4). Again, he pointed to left ventricular ejection fractions of 45, 50 and 51 percent in the evidence (Exhibits 19F, p. 5, p. 10; and 13F, p. 10). He also testified there is no precise diagnosis for sleep apnea, and there have been no pulmonary attacks. Lastly, I note no one has advised the claimant to sit wither her legs elevated. Also, it is not immediately

> clear why the claimant's asthma, which seems to respond to treatment, would
> necessitate she work in a completely stress-free environment. Finally, I find no
> reason for the fine/gross manipulation restrictions imposed in Exhibit 21F. Thus,
> these assessments are given little weight.

(R. at 26 (emphasis omitted).) The ALJ had earlier explained that objective medical evidence showed the following: normal movement in all of the Plaintiff's joints; no anatomic deformity, swelling, stiffness, effusion, skin discoloration or increased skin warmth in the wrists or hands; normal grip strength; no evidence of ischemia from treadmill testing; and generally normal to near-normal ejection fractions with only mild abnormalities in cardiac workups. The ALJ noted that one of the questionnaires was completed by a sleep specialist, and the other by a staff member at Gary Community Health Center.

Using the factors outlined in 20 C.F.R. § 404.1527, the ALJ provided sufficient reason why he did not give controlling weight to the opinions of two treating physicians and gave more weight to Dr. Jilhewar's opinion than to that of the treating physicians. His reasoning provides "an accurate and logical bridge between the evidence and the result." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999). Although one of the reasons the ALJ cited—that "the [treating physicians'] assessments appear to be based in part on the erroneous assumption that the claimant has New York Heart Association class III heart disease"—was not an assumption that actually impacted the treating physicians' opinions, the ALJ cited specific objective medical findings to support the weight he afforded their opinions and whether he could accept their restrictions as well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record. Supportability and consistency, as opposed to any doctor's particular speciality, appeared to most influence the ALJ's determination.

This Court's task is limited to determining whether the ALJ's factual findings are supported by evidence that a reasonable person would accept as adequate to support the conclusion. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).Weighing conflicting evidence from medical sources is what the ALJ is required to do. *Cf. Young*, 362 F.3d at 1001 (noting that the ALJ weighs conflicting evidence from medical experts and the court may not reweigh the evidence). The ALJ did not ignore the findings of the Plaintiff's treating physicians, but considered them in light of all the evidence in the record. Because the conclusion the ALJ reached regarding the weight to attribute to competing opinions regarding functional limitations was supported by substantial evidence, it cannot be disturbed by this Court. The Court adopts the portion of the Report and Recommendation related to the ALJ's assessment of competing opinions, and upholds the ALJ's findings regarding the weight to afford to those opinions.

**CONCLUSION**

For the foregoing reasons, the decision of the Commissioner is AFFIRMED IN PART and REVERSED IN PART and REMANDED for further proceedings not inconsistent with the findings of this Court. The Report and Recommendation [DE 21] is ADOPTED IN PART and REJECTED IN PART.

SO ORDERED on January 25, 2010.

        s/ Theresa L. Springmann
        THERESA L. SPRINGMANN
        UNITED STATES DISTRICT COURT
        FORT WAYNE DIVISION